LOVELL v. ISIDORE NEWMAN & SON.

(Circuit Court, E. D. Louisiana. June 27, 1911.)

No. 13,839.

BANKRUPTCY (§ 140*)—SALE OF PROPERTY—APPLICATION—FORGED BILLS OF LADING—DELIVERY OF PROPERTY UNDER GENUINE LAW.

Bankrupts, having sold a quantity of cotton through their broker to various Italian spinners, forged certain bills of lading purporting to show shipment of the entire quantity to be carried to New Orleans and thence to Genoa by the line specified in the contract, consigned to the shippers' order, with instructions to notify the broker. They then drew drafts for the value of the cotton at the price for which it had been sold, and annexed the fraudulent bills of lading, together with the insurance certificates and invoices, the whole apparently in strict conformity to the contract, discounted the drafts, and received the money. The spinners ultimately paid the drafts. More than two months after the time the cotton should have been delivered under the contract, the bankrupts did ship an identical quantity of cotton, consigned according to the forged bills, and after obtaining bills of lading for this cotton held the same in their hands, but, before the cotton had cleared the port, bankruptcy intervened, and a quantity of it was claimed by the receivers from the steamship on which it had been placed. *Held* that, the contracts of sale being valid, they were fulfilled and became executed when the cotton was actually delivered to the carriers, the stipulations as to time of delivery,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

time and manner of payment being accidental merely, and that the bankrupts and their trustee were estopped to deny that the cotton shipped belonged to the buyers.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

Action by W. S. Lovell, as trustee in bankruptcy of Knight, Yancey & Co., against Isidore Newman & Son. Judgment for defendants.

Dufour & Dufour and Percy, Benners & Burr, for plaintiff.

Dart, Kernan & Dart and Wheeler, Cortis & Haight, for defendants.

FOSTER, District Judge. This suit is by W. S. Lovell, trustee of Knight, Yancey & Co., bankrupts, against Isidore Newman & Son, sureties on a bond given by the master of the steamship Ingelfingen. Certain parties in interest have intervened and joined the defendant, setting up the same defense.

The parties by stipulation have waived the jury and submitted the matter to me on an agreed statement of facts.

It appears that between December 15, 1909, and January 29, 1910, Knight, Yancey & Co., through their agent at Genoa, Gino Gavarati, entered into eight written contracts for the sale of 1,400 bales of cotton to various Italian spinners; the contracts reading substantially as follows:

Messrs. ——————————

We beg to confirm that we have sold to you to-day for the account of Messrs. Knight, Yancey & Company, Decatur (Alabama)
quantity, 200 bales (two hundred)
quality, fully low middling white number 8 type, sealed.
price, 7.50 per pound (seven pence and fifty-one-hundredths)
terms, C. i. f. & 6% Genoa. Allowance on weight 1%.
Shipment, January/February (by Catoniera Line)
Conference bill. Contract—Arbitration Liverpool.
Reimbursement 90 days sight draft Banca Commerciale Italiana, Milan, payable in London.                                    Gino Gavarati.
[Translated.]

During January and February, 1910, without shipping any cotton at all, Knight, Yancey & Co. counterfeited and forged 13 bills of lading, purporting to show the receipt of 1,400 bales of cotton by the Southern Railway at points in Alabama, to be carried by the said railway to New Orleans and thence to Genoa by the Catoniera Line, consigned to their own order, with instructions to notify Gino Gavarati. They then drew drafts for the value of the cotton at the price for which they had sold it and, annexing the fraudulent bills of lading, together with insurance certificates and invoices, the whole apparently in strict conformity to the contract, discounted the drafts and obtained the money. The spinners ultimately paid the drafts.

Thereafter, on March 16 and 17 and April 1, 6, 7, and 11, 1910, Knight, Yancey & Co. did ship 1,400 bales of cotton precisely as they had pretended by the forged bills of lading; the grade, weights, and marks of the cotton, the points of shipment and destination, the carriers, the form of the bill of lading, and everything to the most minute particular being exactly as shown by the said documents.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

On April 20, 1910, Knight, Yancey & Co. were adjudicated bankrupts, and receivers were appointed to take charge of their assets. The cotton had been transported to New Orleans. 89 bales had gone forward, but 1,311 bales were then on board the steamship Ingelfingen. Before the Ingelfingen cleared, the receivers proceeded against her in the district court of this district, and, claiming the cotton, asked for an injunction to prevent its removal out of the United States pending the suit. The injunction issued, but the vessel was permitted to give bond and sail with the cotton. The condition of the bond is that the trustee shall establish his right, title, and interest in and to the said cotton, or any part thereof, and it stipulates that suit may be brought against the surety alone.

Knight, Yancey & Co. had the genuine bills of lading in their possession when adjudicated bankrupts, and plaintiff relies upon his possession of them, indorsed over to him by the bankrupts, and claims the absolute title to the cotton, disclaiming any intention to avoid a preference.

Defendants contend that Knight, Yancey & Co., by marking the exact amount of cotton, of the right grade, identically as shown in the forged bills of lading and other documents, and shipping it by the same carriers in the same way, appropriated it to the said contracts; that delivery to the railroad was delivery to them; that Knight, Yancey & Co. had no intention to retain title in themselves, but intended to suppress the genuine bills of lading and permit the cotton to be claimed by the spinners on the forged bills of lading; that the trustee is estopped to contest their ownership of the cotton or the genuineness of the forged bills of lading.

To this plaintiff responds that the contracts called for January and February delivery, which was not complied with; that, as the buyer could not have been compelled to accept delivery, there was no appropriation; that delivery could only be made by indorsing and turning over the bills of lading; that Knight, Yancey & Co., by holding the genuine bills of lading, to their own order, retained the legal ownership of the cotton, and it passed to him on their adjudication as bankrupts and his election as trustee; and that, as trustee, there is no estoppel against him.

The able arguments and exhaustive citations of authority by both sides have been of great aid, and I regret that I have not the time to discuss them fully. However, in my opinion, the problem here presented is readily solved by the application of well-settled principles of law; the ultimate facts, which I am bound to find from the evidence before me, being once determined.

It is certain that Knight, Yancey & Co. and the spinners entered into valid contracts of sale, and thereby Knight, Yancey & Co. obligated themselves to deliver the goods, and the spinners to pay the price. By the contract, Knight, Yancey & Co. were to make delivery not later than February 28, 1910, to a carrier at such point in the United States as they might select; the goods to be transported from the United States to Genoa by the Catoniera Line. They were also obligated to insure the goods for the benefit of the purchasers and

to allow for the freight to destination. The purchasers were obligated to accept drafts when presented with bills of lading and other documents attached, showing compliance as to delivery, and to ultimately pay the drafts. I understand this to be the well-settled meaning given to the contracts by commercial usage, and, even if this were not so, it is certainly the interpretation of the parties.

By false representations Knight, Yancey & Co. obtained payment before it was due, as they made no delivery, but they did subsequently make delivery of the cotton in exactly the manner contemplated. The delivery was accepted by the spinners, and the contracts thereby became executed, as each party had discharged his obligation. This was before bankruptcy.

The stipulations as to the time of delivery, time and manner of payment, et cetera, were merely accidental, and the parties for whose benefit they were inserted could waive them without affecting the contract. Delivery was complete when the cotton was given into the custody of the carrier, and it belonged to the buyer, subject, of course, to the lien of the bona fide holder of the bill of lading. Necessarily it was appropriated to the contract before delivery. The bill of lading to the order of Knight, Yancey & Co. was solely to enable them to collect the purchase price as if a cash transaction, according to the usage of the trade. When they had received payment in advance, no matter how, their retention of the bill of lading gave them no right in or control over the cotton as against these defendants. No doubt, Knight, Yancey & Co. intended to suppress the genuine bills of lading and to let the cotton be claimed on the forged ones; but it is useless to speculate as to what their intentions were, or what they might or could have done in the premises, as the fact is that after receiving the bills of lading they did nothing, and no rights of innocent third persons are involved. At the moment of adjudication, the cotton formed no part of the assets of Knight, Yancey & Co., and they had no lien on it or right to retain the bills of lading. The trustee stands in no better position towards these defendants than did the bankrupts. He is subject to any equity that would have estopped them. It is clear that Knight, Yancey & Co. could have asserted no claim to this cotton as against the buyers.

There will be judgment for the defendants and interveners, rejecting the plaintiff's demand. And for costs.